IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

**JASMINE BRAZIER ON BEHALF OF
SHEILA M. PYLES[1],**

    Plaintiff,

    v.

**COMMISSIONER OF SOCIAL SECURITY,**

    Defendant.

Case No. 5:19 CV 2073

Magistrate Judge James R. Knepp II

MEMORANDUM OPINION AND ORDER

## INTRODUCTION

Plaintiff Jasmine Brazier ("Plaintiff") filed a Complaint against the Commissioner of Social Security ("Commissioner") on behalf of Sheila M. Pyles ("Pyles"), seeking judicial review of the Commissioner's decision to deny disability insurance benefits ("DIB"). (Doc. 1). The district court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). The parties consented to the undersigned's exercise of jurisdiction in accordance with 28 U.S.C. § 636(c) and Civil Rule 73. (Doc. 12). For the reasons stated below, the undersigned affirms the decision of the Commissioner.

## PROCEDURAL BACKGROUND

Pyles filed for DIB in March 2016, alleging a disability onset date of October 18, 2014. (Tr. 224-26). Her claims were denied initially and upon reconsideration. (Tr. 144-47, 149-51). She then requested a hearing before an administrative law judge ("ALJ"). (Tr. 162-63). Pyles (represented by counsel), and a vocational expert ("VE") testified at a hearing before the ALJ on October 27, 2017. (Tr. 29-77). On July 11, 2018, the ALJ found Pyles not disabled in a written

---

1. Tragically, in December 2017, Sheila Pyles was murdered by an abusive boyfriend. *See* Tr. 19, 220. As her next-of-kin, Jasmine Brazier continues this case on Pyles behalf. 20 C.F.R. § 404.503.

decision. (Tr. 12-22). The Appeals Council denied Pyles's request for review, making the hearing decision the final decision of the Commissioner. (Tr. 1-3); *see* 20 C.F.R. §§ 404.955, 404.981. Plaintiff timely filed the instant action on September 10, 2019. (Doc. 1).

## FACTUAL BACKGROUND[2]

Personal Background and Testimony

Pyles was born in December 1963, making her 50 years on her alleged onset date. *See* Tr. 101. She alleged disability due to post traumatic stress disorder ("PTSD"), severe major depression with psychotic features, panic disorder with agoraphobia, bipolar affective disorder, insomnia, and a prolonged QT interval. (Tr. 101-02).

Pyles had a high school education ending in eleventh grade and primarily spent her career as an STNA. (Tr. 37-39).

Pyles lived with her parents but was unable to assist with chores or errands because of pain in her arm (Tr. 40, 43). Her sister took care of the cooking, cleaning, and shopping for Pyles and their parents. *See id.* However, Pyles prepared her own breakfast on a typical morning and her sister cleaned up. (Tr. 55-56). Pyles no longer had friends and did not belong to any social groups; she communicated with cousins through Facebook. (Tr. 41). Pyles's mental health had worsened, specifically, her depression and auditory hallucinations. (Tr. 41-42). The hallucinations told Pyles to hurt herself which resulted in her placement in a local psychiatric ward. (Tr. 43). The medication specifically targeting the hallucinations helped "somewhat" but "not totally". *Id.* Pyles was not taking her medication properly, however, she heard voices even when she did so. (Tr. 53).

---

[2] The undersigned only summarizes records relevant to Plaintiff's arguments. *Kennedy v. Comm'r of Soc. Sec.*, 87 F. App'x 464, 466 (6th Cir. 2003) (issues not raised in opening brief waived).

Pyles had medical appointments around three times per month and saw a mental health professional approximately every two weeks. (Tr. 57-58). She did not believe her medications were helpful because she felt no improvement. (Tr. 58). Some medications made her drowsy and dizzy. (Tr. 60). She had constant suicidal thoughts but would not always share them. (Tr. 58).

When asked why she could not work, Pyles answered that she would not feel safe, that working would be too hard on her, and that she could not work as a STNA without hurting herself or someone else due to her past assault and agoraphobia. (Tr. 62-63).

Relevant Medical Evidence

Pyles treated with psychiatrist Archana Brojmohun, M.D., in September 2013 reporting generalized anxiety disorder, PTSD, and panic disorder with agoraphobia. (Tr. 1047). She admitted to discontinuing two of her five medications because she had been kicked out of her parents' house for a few days. *Id*. No suicidal or homicidal ideations or hallucinations were present. *Id.* Her mental status exam was normal aside from a reserved mood and a restricted and tearful affect; she had intact cognition, judgment, and memory, logical thoughts and normal perceptions. (Tr. 1048). Dr. Brojmohun diagnosed panic disorder with agoraphobia, mood disorder, and PTSD; she prescribed medication. (Tr. 1048, 1050). In October, Pyles reported doing "okay"; she had no suicidal or homicidal ideations, nor any hallucinations, but "had fleeting thoughts of not being around" and had been more irritable. (Tr. 1042). She had a normal mental status examination aside from a restricted affect. (Tr. 1043). Dr. Brojmohun continued Pyles's medications. (Tr. 1043-44).

In November 2013, Pyles was admitted to the hospital for suicidal thoughts and homicidal ideations. (Tr. 761). Although she would not reveal specific details of her homicidal ideations, suicidal was expressed through planning to cut her wrists or jump off a bridge. *Id.* She reported a history of multiple attempts. (Tr. 762). A mental status examination performed the day after

3

admission showed Pyles was oriented with appropriate speech, had a depressed mood and affect, coherent and logical thoughts, fair insight and judgment, and intact memory/cognition. (Tr. 774). Pyles was discharged after a two-day stay with diagnoses of mood disorder not otherwise specified but rule out major depressive disorder, panic disorder with agoraphobia, and PTSD. (Tr. 776).

Pyles saw Dr. Brojmohun in December 2013, "feeling a lot better". (Tr. 1037). She was excited, and a bit worried, because she would soon be moving out on her own. *Id*. Dr. Brojmohun noted a normal mental status examination with an open mood and normal affect. (Tr. 1038). The diagnoses were unchanged from the hospital stay and her medications continued. (Tr. 1038-39).

In May 2014, Pyles reported to Dr. Brojmohun she and her depression were "doing okay until everything went downhill." (Tr. 1032). She had not been to an appointment in five months due to anxiety. *Id.* Dr. Brojmohun told Pyles she could not fill out disability paperwork due to treatment noncompliance. *Id.* Pyles reported her sleeping had been okay, and that she had been taking her medications while feeling hopeless and helpless. *Id.* She denied suicidal and homicidal ideations, along with an absence of all kinds of hallucinations. *Id.* On examination she was restless and tearful with a depressed mood but had intact cognition, memory, and insight. (Tr. 1033). Dr. Brojmohun continued Pyles's medications. (Tr. 1034).

Pyles saw Dr. Brojmohun again in June; she was doing okay. (Tr. 752). Her depression remained unchanged and she was sleeping well. *Id.* Pyles reported no suicidal or homicidal ideations, along with no hallucinations. *Id.* Her mental status exam was "normal" but with a depressed mood and restricted affect; she had normal perceptions, present and adequate insight, and intact cognition and judgment. (Tr. 753). Dr. Brojmohun adjusted Pyles's medications. *Id*.

At another meeting with Dr. Brojmohun in August 2014, Pyles reported her father was in the ICU and her mother attacked her there. (Tr. 750). Pyles's mental status exam was normal but

4

evidenced a reserved mood and restricted affect; she had logical coherent and rational thoughts, and intact cognition, judgment, and memory. *Id.* In September, Pyles reported her depression was a bit better but she was not sleeping well. (Tr. 1016). Her mental status exam was normal with an open mood and a normal and appropriate affect; she had logical, coherent, and rational thoughts, present and adequate insight, and intact memory, judgment, and cognition. (Tr. 1017). In October, Pyles reported her depression was "under control"; she still had no suicidal or homicidal ideations or hallucinations. (Tr. 742). Her mental status exam was normal with an open mood and a normal, appropriate affect; her thoughts, cognition, insight, judgment, and memory were all unchanged. (Tr. 743).

Pyles saw Dr. Brojmohun again in February 2015. (Tr. 740). She reported symptoms of anxiety and noted "nothing is going right". *Id*. Pyles had just returned from a six-week stay in Florida. *Id.* On examination, she had a reserved and depressed mood with a restricted and tearful affect; she maintained intact cognition, judgment, and memory. *Id.* Dr. Brojmohun adjusted her medications. (Tr. 741). In March, Pyles reported a recent move, that she was "doing well" on one of her medications, and her sleep was "okay". (Tr. 737). Her depression was "about the same". *Id*. On examination, she had a depressed and reserved mood with a restricted affect; she had logical thoughts, normal perceptions, and intact cognition and insight. *Id.* By June, Pyles was doing and sleeping well, and had been feeling better than previously. (Tr. 733). She noted some depression and "vague thoughts of hurting herself but nothing that she would act on." *Id.* Her mental status exam was normal but with a reserved mood and restricted affect. (Tr. 734).

In April 2016, Deena Weinstein of Signature Health completed a daily activities questionnaire for Opportunities of Ohioans with Disabilities. (Tr. 969-70). Therein, Ms. Weinstein noted Pyles was independent and could complete food preparation and household chores. (Tr.

5

970). She experienced anxiety in public settings, but "still manages to get her necessities." *Id*. She used public transportation which her case manager helped schedule; Pyles was "sufficient" in her ability to manage money and pay bills. *Id*. She enjoyed walking outdoors for exercise. *Id*. Ms. Weinstein noted Pyles was compliant with appointments and medications. *Id*.

In May 2016, Pyles established care with general practitioner James Lambros, M.D.; she saw him nine times between June 2016 and July 2017. *See* Tr. 1104-30, 1310-15, 1458-62. Dr. Lambros mainly treated Pyles's physical impairment, *see id.*, however, she reported anxiety and depression throughout this time (Tr. 1108, 1118, 1122, 1310, 1316-26, 1451, 1458). Emily Brown, C.N.P. took over Pyles's primary care from Dr. Lambros in September 2017; she made no examination findings at her first appointment. (Tr. 1449-51).

Opinion Evidence

In May 2015, Dr. Brojmohun opined Pyles had an "extreme"[3] degree of impairment in her ability to relate to others, participate in daily activities, maintain attention, concentration, persistence, and pace, sustain a routine without supervision, perform within a schedule, understand, remember, and carry out instructions; respond appropriately to supervision, co-workers, work pressures, or changes in a work setting; use good judgment, perform complex or repetitive tasks, or behave in an emotionally stable manner. (Tr. 420-21). Pyles had a "marked"[4] degree of impairment in her ability to maintain personal habits or perform simple tasks. *Id*. Her condition was likely to deteriorate if she was placed under job-related stress; she would be absent more than three times per month. (Tr. 421).

---

3. The form defines an "extreme" limitation as a "[m]ajor limitation with no useful ability to function (i.e., on task 0-48% of an 8 hr work day)". (Tr. 420).

4. The form defines "marked" as a "[s]erious limitation but can generally function well (i.e. on task 88%-100% in an 8 hr work day)". (Tr. 420).

6

In October 2017, Ms. Brown completed medical statement and an "Off-Task/Absenteeism Questionnaire". (Tr. 1668-69). At the time Ms. Brown completed her forms, Pyles had been a patient of hers for three weeks. *See id*. Ms. Brown opined Pyles could not work any hours per day, could stand for sit or less than fifteen minutes at one time, stand or sit for less than sixty minutes in a workday, or lift less than five pounds on an occasional or frequent basis. (Tr. 1668). She could occasionally bend, stoop, balance, engage in fine or gross manipulation bilaterally, raise her arms above shoulder level, work around dangerous equipment, drive, tolerate extreme temperatures or environmental irritants, or tolerate noises or heights. *Id*. She needed to elevate her legs frequently and would be absent more than three times per month. *Id*. Ms. Brown listed Pyles's pain sources as acute fractures and a brain aneurysm. *Id*.

In her absenteeism opinion, Ms. Brown opined Pyles would be off-task approximately 20% of the day and absent approximately four times per month. (Tr. 1669). Ms. Brown listed Pyles's diagnoses and pain sources as "acute fractures", "acute assault", PTSD, "battered adult", bipolar disorder, and a brain aneurism. *Id*. She listed fatigue and impaired judgment as side effects of Pyles's medications. *Id*.

VE Testimony

A VE appeared and testified at the hearing before the ALJ. (Tr. 64-76). The ALJ asked the VE to consider a person with Pyles's age, education, and vocational background who was physically and mentally limited in the manner which the ALJ determined her to be. (Tr. 65-67). The VE opined such an individual could not perform Pyles's past work, but could perform work as a hand packager, table worker, or shipping and receiving weigher. (Tr. 67-68). The VE further

opined that missing eight days of work or more per year would be work preclusive. (Tr. 68-69). Eight days was the "benchmark". (Tr. 69).

ALJ Decision

In a written decision dated July 11, 2018, the ALJ found Pyles met the insured status requirements for DIB through December 31, 2017 and had not engaged in substantial gainful activity from her alleged onset date (October 18, 2014), through her date of death. (Tr. 15). The ALJ concluded she had severe impairments of affective disorder, including major depressive disorder and bipolar disorder; panic disorder with agoraphobia; PTSD; and disorders of the spine, *id.*, but found these impairments (alone or in combination with any other) did not meet or medically equal the severity of a listed impairment (Tr. 16). The ALJ then stated Pyles had the residual functional capacity ("RFC"):

> to perform a full range of work at all exertional levels but with the following nonexertional limitations: she was limited to frequent reaching with the left upper extremity overhead and to all other directions. She could climb ramps and stairs frequently, never climb ladders, ropes, or scaffolds, balance frequently, kneel frequently, crouch frequently, and never crawl. She could work at unprotected heights occasionally. She was limited to repetitive tasks without strict production quotas, was able to interact with supervisors, coworkers, and the public occasionally, and was capable of routine workplace changes. She was limited to frequent operation of hand and foot controls on the left side.

(Tr. 17-18). The ALJ found Pyles was unable to perform past relevant work; was defined as an individual closely approaching advanced age; and had a limited education. (Tr. 20). The ALJ concluded that, given her age, education, work experience, and RFC, Pyles could have performed jobs that existed in significant numbers in the national economy. *Id.* Thus, the ALJ found Pyles not disabled from October 18, 2014 (the alleged onset date), through December 11, 2017 (the date of death). (Tr. 21).

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

## STANDARD FOR DISABILITY

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process—found at 20 C.F.R. § 404.1520—to determine if a claimant is disabled:

1. Was claimant engaged in a substantial gainful activity?

    2.      Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

    3.      Does the severe impairment meet one of the listed impairments?

    4.      What is claimant's residual functional capacity and can claimant perform past relevant work?

    5.      Can claimant do any other work considering her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters*, 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The ALJ considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is she determined to be disabled. 20 C.F.R. §§ 404.1520(b)-(f); *see also Walters*, 127 F.3d at 529.

## DISCUSSION

Plaintiff raises three objections to the ALJ's decision. First, she contends the ALJ did not properly evaluate treating psychiatrist Dr. Brojmohun's medical opinion. Second, she argues the ALJ's evaluation of certified nurse practitioner Emily Brown's medical opinion was not supported by substantial evidence. Finally, Plaintiff objects to the ALJ's evaluation of Pyles's subjective symptoms. The Commissioner responds that the ALJ's decision is supported with each. For the following reasons, the undersigned agrees with the Commissioner and affirms.

Opinion Evidence

Plaintiff argues the ALJ erred because he did not provide the required "good reasons" in assigning little weight to the opinion of Pyles's treating psychiatrist, Dr. Brojmohun. Specifically, she argues the ALJ did not consider Dr. Brojmohun's opinion that she would be absent from work three times per month. This was error, she contends, because such a limitation would be work preclusive. As for Ms. Brown's opinion, Plaintiff argues the ALJ's assessment is unsupported by substantial evidence.

Generally, the medical opinions of treating physicians are afforded greater deference than those of non-treating physicians. *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007); *see also* SSR 96-2p, 1996 WL 374188. A treating physician's opinion is given "controlling weight" if it is supported by (1) medically acceptable clinical and laboratory diagnostic techniques; and (2) is not inconsistent with other substantial evidence in the case record. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). The requirement to give controlling weight to a treating source is presumptive; if the ALJ decides not to do so, he must provide evidentiary support for such a finding. *Id.* at 546; *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376-77 (6th Cir. 2013). When the physician's medical opinion is not granted controlling weight, the ALJ must give "good reasons" for the weight given to the opinion. *Rogers*, 486 F.3d at 242 (quoting 20 C.F.R. § 416.927(d)(2)).

"Good reasons" are reasons "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Id.* (quoting SSR 96-2p, 1996 WL 374188, at *4). When determining weight and articulating good reasons, the ALJ "must apply certain factors" to the opinion. *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 660 (6th Cir. 2009) (citing 20 C.F.R. § 404.1527(d)(2)). These

11

factors include the length of treatment relationship, the frequency of examination, the nature and extent of the treatment relationship, the supportability of the opinion, the consistency of the opinion with the record as a whole, and the specialization of the treating source. *Id.* While an ALJ is required to delineate good reasons, he is not required to enter into an "exhaustive factor-by-factor analysis" to satisfy the requirement. *See Francis v. Comm'r of Soc. Sec. Admin.*, 414 F. App'x 802, 804-05 (6th Cir. 2011).

Under the regulations, a "treating source" includes physicians, psychologists, or "other acceptable medical source[s]" who provide, or have provided, medical treatment or evaluation and who have, or have had, an ongoing treatment relationship with the claimant. 20 C.F.R. § 404.1502. "[A]cceptable medical source[s]" include "licensed physicians" and "licensed or certified psychologists." 20 C.F.R. § 404.1513(a)(1)–(2). Evidence from those who are "not acceptable medical sources" or "other sources", is also "important and should be evaluated with key issues such as impairment severity and functional effects, along with other relevant evidence in the file." SSR 06-3p, 2006 WL 2329939, at *2. The ALJ "generally should explain the weight given to opinions from these 'other sources,' or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the [ALJ's] reasoning, when such opinions may have an effect on the outcome of the case." *Id.* at *6. Interpreting SSR 06-3p, the Sixth Circuit explained that "[o]pinions from non-medical sources who have seen the claimant in their professional capacity should be evaluated by using the applicable factors, including how long the source has known the individual, how consistent the opinion in with other evidence, and how well the source explains the opinion." *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 541 (6th Cir. 2007). A nurse practitioner, like Ms. Brown, is an "other source". *Id.*

Here, the ALJ addressed Dr. Brojmohun's opinion together with that of Ms. Brown, and explained why he assigned "little weight" to each:

> [T]he undersigned gives little weight to the opinions of Archana Brojmohun, M.D. . . . and Emily Brown, CNP (Ex. B4F, B31F, B34F). Dr. Brojmohun's statement that the claimant suffers from many extreme limitations is not consistent with the claimant's activities of daily living or her treatment notes with Dr. Brojmohun (Ex. B13F). . . . Ms. Brown's statement regarding the claimant's physical limitations was based upon the claimant's recent injuries, and Ms. Brown did not venture an opinion regarding long-term functioning (Ex. B34F).

(Tr. 20). These are valid, supported reasons for not granting a treating source "controlling weight." 20 C.F.R. § 404.1527(c)(2) (a treating source opinion is only granted controlling weight when it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and is "not inconsistent with other evidence of record".). Moreover, the cited evidence is substantial and provides effective reasoning for the ALJ to assign "little weight" to the opinions of Dr. Brojmohun and Ms. Brown. (Tr. 20).

As the ALJ accurately concluded, Dr. Brojmohun's treatment notes were consistently different than her limiting analysis of what she found Pyles capable of, including the inability to maintain regular work attendance. For example, in August 2014, Pyles had a normal mental status examination with Dr. Brojmohun. (Tr. 1022). With the exception of a reserved mood and restricted affect, she had logical thoughts, normal perceptions, intact cognition and judgment, and present and adequate insight. *Id*. Similarly, in September 2014, Pyles again had a normal mental status exam with Dr. Brojmohun. (Tr. 1017). Pyles had a normal and appropriate affect during that visit as well as an open mood; she again had intact cognition and judgment, formal perceptions, and present and adequate insight. *Id*. These findings were repeated during an October 2014 visit with Dr. Brojmohun. (Tr. 1012). Even in February 2015 when Dr. Brojmohun found Pyles had a depressed mood and restricted affect, she still determined Pyles maintained logical and rational

13

thoughts, and had intact cognition, judgment, and memory. (Tr. 1007-08). These examples provide substantial evidence for the ALJ's assessment that Dr. Brojmohun's severely limiting opinion, including absenteeism, was inconsistent with her treatment notes. The ALJ's reasoning here directly implicates the factor of supportability. 20 C.F.R. § 404.1527(c); *Leeman v. Comm'r of Soc. Sec.*, 449 F.App'x 496, 497 (6th Cir. 2011) ("ALJs may discount treating-physician opinions that are inconsistent with substantial evidence in the record, like the physician's own treatment notes.").

The ALJ also found Dr. Brojmohun's opinion inconsistent with Pyles's activities of daily living. Plaintiff contends the ALJ erred when he did not cite directly to a record page after making this assertion. (Doc. 13, at 19). However, an exact citation is not necessary where a reviewing court can easily trace the ALJ's path of reasoning, *Stacey v Comm'r of Soc. Sec.*, 451 F. App'x 517, 519 (6th Cir. 2011); it may look to other parts of the opinion to do so. *Murphy v. Comm'r of Soc. Sec.*, 2019 WL 6463392, at *1 (N.D. Ohio) (finding an ALJ's decision to discount an opinion as not "consistent with the medical evidence of record, which supports generally mild findings" sufficient where it was "clear from [his earlier] discussion which mild findings the ALJ was referring to"). Here, the ALJ specifically addressed Pyles's activities of daily living just a few paragraphs earlier. (Tr. 19). The ALJ highlighted Pyles exercising outdoors, using public transportation, spending time with her sister, and traveling. *Id.* (citing Tr. 731, 740, 969-70). The ALJ also noted Pyles's counselor found her capable of household chores. *Id.* (citing Tr. 970). When articulating "good reasons", activities of daily living are just one of the many factors an ALJ considers. *Rabbers*, 582 F.3d at 660 (citing 20 C.F.R. § 404.1527(d)(2)).

As for Ms. Brown, the ALJ found her evaluation unsupported because it was based on Pyles's "recent injuries" and did not evaluate the duration of her impairments. (Tr. 20). This is

14

accurate. The first page of Ms. Brown's opinion offers only physical limitations and is based upon pain associated with acute fractures – recent injuries. (Tr. 1668). Thus, it was reasonable for the ALJ to read these as temporary, rather than long-term restrictions. The second page of her opinion offers an off-task/absenteeism opinion, however, in support, Ms. Brown only lists Pyles's diagnoses and notes she may have some drowsiness/fatigue due to her medications. (Tr. 1669). The regulations contemplate opinions such as these which are unsupported by anything but a diagnosis list. 20 C.F.R. § 404.1527(c)(3) ("The better an explanation a source provides for a medical opinion, the more weight we will give that medical opinion."). Further, as explained, because Ms. Brown is a nurse practitioner, she is not accorded the same amount of deference as a treating physician and the explanation requirements are much less stringent. SSR 06-3p, 2006 WL 2329939, at *6. When weighing any medical opinion, the length of treatment is one criterion that should be evaluated. 20 C.F.R. § 404.1527(c)(2)(i). Pyles was cared for by Ms. Brown only during the period of September 22, 2017 through October 13, 2017 – three weeks. (Tr. 1668). Thus, it was not unreasonable for the ALJ to consider that Ms. Brown's opinion did not evaluate Pyles's "long term functioning". (Tr. 20).

The ALJ's analysis with each physician is brief to be sure and Plaintiff certainly points to evidence which may suggest a different outcome. However, even if substantial evidence supports a Plaintiff's position, this Court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones*, 336 F.3d at 477. Here, the Court concludes that it does.

Subjective Symptoms

Plaintiff also objects to the ALJ's evaluation of Pyles's subjective symptoms. In support, Plaintiff contends Pyles's "statements about the intensity, persistence, and limiting effects of her psychiatric symptoms are fully consistent with the objective medical and other evidence of

record". (Doc. 13, at 25). This is as far as Plaintiff's "argument" goes and it is nothing more than a request for the Court to reevaluate the record evidence, which it cannot, and will not, do. *See Reynolds v. Comm'r of Soc. Sec.*, 424 F.App'x. 411, 414 (6th Cir. 2011) ("This court reviews the entire administrative record, but does not reconsider facts, re-weigh the evidence, resolve conflicts in the evidence, decide questions of credibility, or substitute its judgment for that of the ALJ."). ! Regardless, the Court finds the ALJ's subjective symptom analysis supported by substantial evidence and affirms.

When a claimant alleges impairment-related symptoms, the Commissioner follows a two-step process to evaluate those symptoms. 20 C.F.R. § 404.1529(a); SSR 16-3p, 2017 WL 5180304, *2-8.[5] First, the ALJ must determine whether there is an underlying medically determinable physical or mental impairment that could reasonably be expected to produce the claimant's symptoms, *e.g.*, pain. SSR 16-3p, 2017 WL 5180304, *3-4. Second, the ALJ must evaluate the intensity and persistence of the claimant's symptoms to determine the extent to which those symptoms limit the claimant's ability to perform work-related activities. *Id.* at *3, 5-8. To evaluate a claimant's subjective symptoms, an ALJ considers the claimant's complaints along with the objective medical evidence, information from medical and non-medical sources, treatment

---

5. SSR 16-3p replaces SSR 96-7p and applies to ALJ decisions on or after March 28, 2016. *See* 2017 WL 5180304, at *1, 13. The ALJ's decision here is dated July 11, 2018 and thus SSR 16-3p applies. SSR 16-3p clarifies the language of the pre-existing standard in SSR 96-7p, 1996 WL 374186 (1996) to the extent that it "eliminated the use of the term 'credibility' in the sub-regulatory policy and stressed that when evaluating a claimant's symptoms the adjudicator will not 'assess an individual's overall character or truthfulness' but instead 'focus on whether the evidence establishes a medically determinable impairment that could reasonably be expected to produce the individual's symptoms and given the adjudicator's evaluation of the individual symptoms, whether the intensity and persistence of the symptoms limit the individual's ability to perform work-related activities....'" *Huigens v. Soc. Sec. Admin.*, 718 F. App'x 841, 848 (11th Cir. 2017) (quoting *Hargress v. Soc. Sec. Admin.*, 874 F.3d 1284, 1289-90 (11th Cir. 2017) (quoting in part SSR 16-3p)). Both rulings refer to the two-step process in 20 C.F.R. § 416.929(c).

16

received, and other evidence. *Id.* at *5-8. In addition to this evidence, the ALJ must consider the factors set forth in 20 C.F.R. § 404.1529(c)(3). *Id.* at *7-8. Those factors include daily activities; location, duration, frequency, and intensity of pain or other symptoms; factors that precipitate and aggravate the symptoms; type, dosage, effectiveness, and side effects of any medication taken to alleviate pain or other symptoms; treatment, other than medication for relief of pain or other symptoms; measures other than treatment a claimant uses to relieve pain or other symptoms, *e.g.*, lying flat on one's back; and any other factors pertaining to a claimant's functional limitations and restrictions due to pain or other symptoms. 20 C.F.R. § 404.1529(c)(3). Although the ALJ must "consider" the listed factors, there is no requirement that he discuss every factor. *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 287 (6th Cir. 2009).

The Sixth Circuit has explained, interpreting SSR 96-7p, the precursor ruling, that "an administrative law judge's credibility findings are virtually unchallengeable". *Ritchie v. Comm'r of Soc. Sec.*, 540 F. App'x 508, 511 (6th Cir. 2013) (internal citation omitted). Nevertheless, the ALJ's decision "must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." SSR 16-3p, 2017 WL 5180304, at *10.

Here, the ALJ correctly identified the two-step process (Tr. 18), summarized Pyles's mental health treatment history (Tr. 18-19), and offered his assessment of her subjective symptoms:

> Although the record indicates persistent evidence of mental impairment, including particularly depressed mood and affect, it does not support her allegations of impairment of her memory or concentration, as mental status examination[s] consistently indicated normal findings in these areas (Ex. B6F/43, B8F/12, B12F/13, B13F/3). Although she reported symptoms of panic attacks in public, she also reported enjoying spending time outside walking in nice weather and the

17

> ability to use public transportation (Ex. B8F/66, B11F). Records indicate that she reported panic attacks regularly, but on a fairly infrequent basis, with, for instance, one reported panic attack between medical visits in April 2016 (Ex. B12F/8). Contrary to the claimant's testimony, her therapist reported that the claimant was capable of household chores, and that she visited with family and friends on an occasional basis (Ex. B11F). In sum, while the evidence indicates that the claimant suffered from severe mental impairments, it does not fully support the claimant's allegations regarding the severity or persistence of her mental symptoms.

(Tr. 19).

The record includes detailed evidence of Pyles's mental impairment. However, as the ALJ accurately noted, repeated medical evaluations of Pyles demonstrated unaffected concentration or memory levels. (Tr. 734, 737, 740, 743, 750, 753, 774, 1017, 1033, 1038, 1043, 1048). And, even with anxiety, she enjoyed outside walks when the weather was nice along with using public transportation and going to the store. (Tr. 731, 970). Also, she had traveled to Florida for a six-week period. (Tr. 740). Contrary to Pyles's testimony, her therapist noted how Pyles was capable of household chores and visiting with friends and family throughout each month. (Tr. 969). As the ALJ explained, while the evidence shows she suffered from severe mental impairments, Pyles's allegations of the severity and limiting effects of her symptoms are not fully supported. The ALJ's rationale properly contemplates the objective evidence, SSR 16-3p, 2017 WL 5180304, *5, and regulatory factors, 20 C.F.R. § 404.1529(c)(3).

For these reasons, the undersigned finds no error and affirms the ALJ's decision.

## CONCLUSION

Following review of the arguments presented, the record, and the applicable law, the undersigned finds the Commissioner's decision denying DIB supported by substantial evidence and affirms that decision.

      s/ James R. Knepp II
      United States Magistrate Judge